**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

RACHEL COKER,            :
                               :

        Plaintiff,        :
                               :

        v.                  :      CIVIL ACTION NO.
                               :      2:11-CV-0091-RWS

ENHANCED SENIOR LIVING,     :
INC., CAMERON HALL OF       :
ELLIJAY, LLC, and CAMERON    :
STAFFING SERVICES, LLC,      :

        Defendants.

## ORDER

This case comes before the Court on Plaintiff's Motion for Partial

Summary Judgment [34], Defendants' Motion for Summary Judgment [35],

Defendants' Motion for Leave to Amend Statement of Material Facts [46], and,

finally, Plaintiff's Motion for Leave to File Supplemental Brief Due to

Admission <u>In</u> <u>Judicio</u> [56].  After reviewing the record, the Court enters the

following Order.

### Background

Plaintiff Rachel Coker ("Plaintiff") initiated this litigation by filing a

Complaint against Defendants, her former employers, alleging discrimination

and retaliation in violation of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101, et seq. (See generally Compl., Dkt. [1].) In particular, Plaintiff alleges in Count I of the Complaint that she is disabled within the meaning of the ADA and that Defendants discriminated against her because of her disability by failing to reasonably accommodate it. (Id. ¶¶ 18-22.) In Count II, Plaintiff alleges that Defendants retaliated against Plaintiff for requesting a reasonable accommodation of her disability by terminating her employment.[1] (Id. ¶¶ 23-26.) Plaintiff now moves for partial summary judgment, seeking judgment as a matter of law solely on the issue of whether Plaintiff has a "disability" within the meaning of the ADA. (See generally Pl.'s Mot. for Partial Summ. J., Dkt. [34].) Defendants cross move for summary judgment, seeking judgment as a matter of law on both of Plaintiff's claims in their entireties. (See generally Defs.' Mot. for Summ. J., Dkt. [35].) Except where otherwise indicated, the following facts are undisputed.

## I.      Plaintiff's Breast Disease

Plaintiff alleges that she is "disabled" within the meaning of the ADA as

---

[1] Plaintiff has abandoned the claim set out in Count III of the Complaint and is proceeding only on Counts I and II. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n Br."), Dkt. [42] at 2 n.1.)

a result of breast disease, which was diagnosed in the fall of 2009. Prior to this diagnosis, Plaintiff experienced multiple, painful lumps on her breast and noticed unusual discharge. (Pl.'s Statement of Additional Material Facts As To Which Respondent Contends There Are No Genuine Issues To Be Tried ("Pl.'s Statement of Additional Facts"), Dkt. [42-2] ¶ 3.) In November 2009, after having a mammogram and ultrasound test, Plaintiff was referred to Dr. Rosa Langella, a Board Certified specialist and active member of the American Society of Breast Surgeons, who has been treating women with breast cancer and breast disease since 1997. (Id. ¶ 5.) Dr. Langella observed several masses or nodules on both of Plaintiff's breasts and diagnosed Plaintiff with breast disease. (Id. ¶¶ 6-7, 9.)

On January 10, 2010, Dr. Langella performed surgery on Plaintiff to remove and biopsy masses from both breasts. (Id. ¶ 10.) The masses tested negative for cancer. (Id. ¶ 12.) On May 17, 2010, Dr. Langella again examined Plaintiff, who complained that she had been experiencing spontaneous breast discharge for several months. (Affidavit of Rosa L. Langella, M.D. ("Langella Aff."), Dkt. [34-3] ¶ 4.) Dr. Langella again found masses on both breasts and

3

recommended a bilateral major breast duct excision and excision of the masses, which procedure was scheduled for June 3, 2010. (Id.)

On the date of this appointment, Dr. Langella gave Plaintiff a medical note that read, "New onset breast disease. . . . Patient was treated by me on 5/17/10 in the office–at this time she was sch [sic] for surgery to be done 6/3/10." (Pl.'s Statement of Additional Facts, Dkt. [42-2] ¶ 37.) Plaintiff returned to work on May 19, 2010 and, as discussed in Part III, infra, gave her supervisor the medical note and asked for time off for surgery. (Id. ¶¶ 38-42.) As discussed in Part III, Plaintiff's employment was terminated on the same date. (Id. ¶ 62.)

Plaintiff subsequently underwent surgery as scheduled on June 3, 2010. (Id. ¶ 5.) Dr. Langella saw Plaintiff for follow-up on June 8, 2010 and June 29, 2010. (Id. ¶ 5.) Dr. Langella concluded that the masses on Plaintiff's breasts, "while not cancerous, cannot be considered benign" and are "the result of abnormal cell growth and abnormal endocrine and reproductive functioning." (Id. ¶ 5.)

## II. Plaintiff's Employment with Defendants

In September 2008, prior to the diagnosis of her breast disease, Plaintiff

AO 72A
(Rev.8/82)

was hired to work as a cook for Defendants in Cameron Hall of Ellijay ("Cameron Hall") (id. ¶ 1), an assisted living facility (Affidavit of Sarah Jean ("Jean Aff."), Dkt. [35-3] ¶ 2). Defendants' employee handbook identified excessive smoking, failure to complete work assignments, and excessive absence as disciplinary infractions. (Defs.' Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried ("Defs.' SMF"), Dkt. [35-12] ¶ 2.) Defendants contend that throughout the end of Plaintiff's employment, Plaintiff was in regular violation of these policies–repeatedly failing to show up for work, leaving work early, and smoking excessively during her shifts. (See generally id.)

At the time of Plaintiff's employment, Cameron Hall had approximately twenty to twenty-five (20-25) total employees, including a kitchen staff of two to three (2-3) persons, making prompt and regular attendance critical. (Id. ¶ 5.) From the outset of her employment, Plaintiff understood that prompt and regular attendance was important. (Id. ¶ 6.) Indeed, between May and September of 2009, Plaintiff was in regular attendance, with the exception of a single incident in May 2009 when she received written discipline for failing to report to her shift. (Jean Aff., Dkt. [35-3] ¶ 4.) Defendants contend that

beginning in September 2009, however, Plaintiff "repeatedly left work before her shift was over, called out[2] on short notice, and requested numerous days off." (Defs.' SMF, Dkt. [35-12] ¶ 7.) Plaintiff does not dispute that due to her frequent and unscheduled absences, Defendants found it necessary, in the Fall of 2009, to train one of the caregivers at Cameron Hall to work in the kitchen in order to fill in for Plaintiff. (Id. ¶ 10.)

Defendants state that Plaintiff was absent forty-two (42) days from September 1, 2009 through May 19, 2010, excluding the days Plaintiff left work early. (Id. ¶ 9.) Specifically, Defendants contend that on January 24, 2010, three days after she returned from leave for her January surgery, Plaintiff had a call out. (Id. ¶ 11.) They further contend that Plaintiff was out on short notice between February 8 through 13, called out without notice on February 21, and was absent again on short notice between April 7 and 8. (Id. ¶ 13.) In addition to these absences, Defendants state that Plaintiff repeatedly left work early, resulting in complaints that Plaintiff's duties were not being completed. (Id. ¶

_____

[2] Defendants explain a "call out" to be an absence reported by an employee on the day of her shift as opposed to arranged in advance. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem."), Dkt. [35-1] at 4 n.1 (citing 12/2/2011 Dep. of Rachel Coker ("Coker Dep."), Dkt. [36] at 41-42).)

AO 72A
(Rev.8/82)

14.)  Plaintiff, along with her direct supervisor, Debbie Ledbetter, also received

written discipline for violation of Defendants' smoking policy on December 19,

2009.  (Id. ¶ 15.)

On April 13, 2010, Plaintiff was suspended for two days, according to

Defendants for "performance issues including [Plaintiff's] attendance problems,

violation of the smoking policy, and her unprofessional interactions with co-

workers."  (Id. ¶ 16.)  Plaintiff was not permitted to clock in or work at all on

that date, in accordance with Defendants' policy that "if somebody is being

disciplined, then it needs to be handled right away, when they walk in on their

shift."  (Pl.'s Statement of Additional Facts, Dkt. [42-2] ¶ 16 (quoting 11/30/11

Dep. of Sara Jean ("Jean Dep."), Dkt. [38-1] at 84:24-85:1).)  According to

Defendants, of the sixteen days Plaintiff worked following her suspension, she

left work before her shift was over seven (7) times and called out absent on

May 11 and 12.  (Id. ¶ 18.)

Plaintiff does not dispute that her overall attendance record was "far

worse than any other employee at the Ellijay facility."  (Id. ¶ 8; Pl.'s Resp. to

Defs.' SMF, Dkt. [41] ¶ 8.)  Nor does she dispute that she was suspended for

7

two days for performance-related issues.[3]  (Pl.'s Resp. to Defs.' SMF, Dkt. [41]

¶ 16.)  Plaintiff does not dispute that she was disciplined for violating the

smoking policy on December 19, 2009, or that she had a call out on January 24,

2010.  (Id. ¶¶ 12, 15.)  She does dispute, however, that she was absent a total of

forty-two days between September 1, 2009 and May 19, 2009 and disputes

certain particular absences identified by Defendants.  (Id. ¶¶ 9, 13.)

In particular, Plaintiff disputes that she was out on short notice between

February 8 and 13.  (Id. ¶ 13.)  Plaintiff contends that she was not scheduled to

work on February 8 and was absent on February 9 for an appointment with Dr.

Langella for breast surgery follow-up, which appointment had been pre-

approved by Plaintiff's supervisor, Ms. Ledbetter.  (Id.)  Plaintiff admits that

she was absent between February 10 and 13, but states that she "advised Ms.

Ledbetter of this [absence]" and that Ms. Ledbetter "did not object."  (Id.)

Plaintiff further disputes that she was absent on February 21, pointing to payroll

---

[3] Plaintiff does not dispute Defendants' assertion that she was suspended for
two days on April 13, 2010.  (Pl.'s Resp. to Defs.' SMF, Dkt. [41] ¶ 16.)  In her
Statement of Additional Facts, however, Plaintiff states that she was suspended for
two days on April 14, 2010.  (Pl.'s Statement of Additional Facts, Dkt. [42-2] ¶ 15.)
This discrepancy appears to be of no moment.

records indicating that Plaintiff worked seven (7) hours on that date.[4] (Id.) While Plaintiff admits that she was absent on April 7 and 8, to be with her mother, who was undergoing surgery, she states that this absence was pre-approved by Defendants after Plaintiff produced a note from her mother's doctor requiring Plaintiff's presence at the surgery. (Id.) Finally, Plaintiff contends that she did not call out absent on May 11 and 12 but, rather, "traded" those two days, with Ms. Ledbetter's approval, to work two earlier days for which Plaintiff had not been scheduled. (Id. ¶ 18.)

## III. Plaintiff's Termination

According to Defendants, on May 17, 2010, Sara Jean, Administrator of Cameron Hall,[5] was informed that Plaintiff had taken twenty-one (21) smoke breaks, in violation of Defendants' smoking policy, over the weekend of May 15 and 16. (Jean Aff., Dkt. [35-3] ¶ 13.) In response to this information, Ms.

---

[4] The Court notes that the payroll records to which Plaintiff refers are contained in Exhibit 1 to Plaintiff's deposition. The Exhibit, however, while referenced in the deposition, was not made a part of the record in this case and therefore cannot be reviewed by the Court. Both parties cite this Exhibit in support of their respective positions on whether Plaintiff worked on September 21. The dispute over this single date is not outcome determinative of any issue in this case, and, therefore, the Court did not require the parties to produce the payroll records for the Court's review.

[5] As Administrator, Ms. Jean is responsible for the overall supervision and operations of Cameron Hall. (Jean Aff., Dkt. [35-3] ¶ 2.)

Jean reviewed video surveillance footage of the smoking area, which confirmed that Plaintiff had taken twenty-one smoke breaks during that time period. (Id.) Ms. Jean thus recommended to Jacob Osaer, Ms. Jean's brother and the acting CEO of the Defendant companies (Aff. of Joann Savage ("Savage Aff."), Dkt. [35-4] ¶ 2), that they terminate Plaintiff's employment "based upon her overall poor performance, violation of attendance and smoking policies." (Jean Aff., Dkt. [35-3] ¶ 17). Mr. Osaer agreed. (Id.) This decision to terminate Plaintiff was approved independently by Joann Savage, the owner of Cameron Hall (and mother of Ms. Jean and Mr. Osaer). (Defs.' SMF, Dkt. [35-12] ¶¶ 25, 28.) Defendants thus contend that the decision to terminate Plaintiff was made on May 17, 2010, prior to Plaintiff's May 19, 2010 request for medical leave. (Id. ¶¶ 27-29; Jean Aff., Dkt. [35-3] ¶ 18; Savage Aff., Dkt. [35-4] ¶ 6.)

Plaintiff paints a different picture of Defendants' decision to terminate her employment. (Pl.'s Resp. to Defs.' SMF, Dkt. [41] ¶ 17; Pl.'s Statement of Additional Facts, Dkt. [42-2] ¶¶ 38-56.) In particular, Plaintiff disputes that the decision was made on May 17, 2010 in response to Plaintiff's violations of the smoking policy and prior to Defendants having any knowledge of Plaintiff's request for medical leave. (Pl.'s Statement of Additional Facts, Dkt. [42-2] ¶¶

40-46, 50-53, 55-56.)  Plaintiff contends, on the contrary, that the decision was made on May 19, 2010 in direct response to her request for leave.  (Id. ¶¶ 40-46, 50-53, 55-56.)

According to Plaintiff, after her appointment with Dr. Langella on May 17 (and having been scheduled off for May 17 and 18), Plaintiff returned to work on May 19 to work her regular shift.  (Id. ¶ 38.)  Plaintiff told Ms. Ledbetter that her breast disease had returned, that she was experiencing unusual breast discharge, and that she needed to undergo repeat breast surgery, during which procedure her nipples may have to be removed.  (Id. ¶ 40.)  She asked Ms. Ledbetter for time off "in two weeks" and that she would need "two weeks off in June."  (Id. ¶¶ 41-42.)

Plaintiff states that upon hearing she would need two weeks off for surgery, Ms. Ledbetter "angrily yanked the medical note [from Dr. Langella] out of Plaintiff's hand."  (Id. ¶ 43.)  Ms. Ledbetter told Plaintiff that she had to discuss this request with Ms. Jean and then proceeded to Ms. Jean's office to discuss "that Plaintiff needed some more time off."  (Id. ¶¶ 46, 50.)  Plaintiff contends that Ms. Ledbetter said nothing to Plaintiff regarding violations of the

11

smoking policy.  (Id. ¶ 49.)  Plaintiff proceeded to clock in for her shift and to

serve lunch to the senior home residents, as usual.  (Id. ¶¶ 58, 59.)

Plaintiff contends that it was during this conversation between Ms.

Ledbetter and Ms. Jean that the decision was made to terminate Plaintiff's

employment.  (Id. ¶ 52.)  Ms. Ledbetter testified in her deposition that she was

driven to talk to Ms. Jean about terminating Plaintiff's employment because

Plaintiff "had still been wanting time off."  (Id. ¶ 53.)  And while Defendants

assert that they were unaware of Plaintiff's request for medical leave when they

decided to terminate Plaintiff, Plaintiff points to an email written by Ms. Jean to

a co-employee at 12:35 pm on May 19, with a subject line of "rae," that read as

follows:

> Excessive smoking on 5-15 & 5-16
>
> It all came up because now she has to be out for 2 weeks to have
> her nipples removed.  She still has milk and puss coming out of
> them.

(Id. ¶ 56; Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), Ex.

A, Dkt. [42-1] at 1-2 of 29.)  The recipient of the email responded, "Nipples,

milk and puss? WHAT? Surely that would require more than 2

weeks!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!"  (Pl.'s Opp'n, Ex. A, Dkt. [42-1] at 1-2 of 29.)  It

is undisputed that Plaintiff was terminated on May 19, 2010.  Plaintiff contends

that the only reason given for her termination was her violation of the smoking

policy and that no reference was made to any attendance problem.  (Pl.'s

Statement of Additional Facts, Dkt. [42-2] ¶¶ 63, 65.)

## IV.   Plaintiff's Claims and the Parties' Motions for Summary Judgment

As stated above, following her termination, Plaintiff filed a Complaint

against Defendants for discrimination and retaliation under the ADA.  (See

generally Compl., Dkt. [1].)  Plaintiff raises her discrimination claim in Count I,

alleging that her breast disease constitutes a "disability" under the ADA, as

amended, and that Defendants discriminated against her because of that

disability by failing to reasonably accommodate it–i.e., by failing to permit

Plaintiff to take medical leave for surgery and, instead, terminating her

employment.  (Id. ¶¶ 18-22.)  In Count II, Plaintiff claims that Defendants

retaliated against Plaintiff for requesting a reasonable accommodation of her

breast disease (i.e., medical leave) by terminating her employment.  (Id. ¶¶ 23-

26.)

Plaintiff now moves for summary judgment solely on the issue of

whether her breast disease constitutes a "disability" under the ADA.  (See

13

generally Pl.'s Mot. for Partial Summ. J., Dkt. [34].)  Defendants, on the other

hand, move for summary judgment on both of Plaintiff's claims in their

entireties.  (See generally Defs.' Mot. for Summ. J., Dkt. [35].)  In support of

their Motion for Summary Judgment on Plaintiff's discrimination claim,

Defendants first argue that Plaintiff is not disabled within the meaning of the

ADA and that, in any event, she is not otherwise qualified for her employment

position due to absenteeism.  (Mem. in Supp. of Defs.' Mot. for Summ. J.

("Defs.' Mem."), Dkt. [35-1] at 14-18.)  With respect to Plaintiff's retaliation

claim, Defendants argue that Plaintiff cannot show that she was terminated

because of her request for a reasonable accommodation.  (Id. at 24-25; Defs.'

Reply Br. in Supp. of Mot. for Summ. J. ("Defs.' Reply"), Dkt. [48] at 2-10.)

On the contrary, Defendants argue that Plaintiff was terminated because of

violations of Defendants' smoking policy and poor attendance.  (Defs. Mem.,

Dkt. [35-1] at 21; Defs.' Reply, Dkt. [48] at 3-10.)  The Court first sets out the

legal standard governing a motion for summary judgment before considering

the parties' motions on the merits.

**Discussion**

## I.    Preliminary Matters

First, Plaintiff moves to file a supplemental brief in opposition to

Defendants' Motion for Summary Judgment (i.e., a surreply) to address an

argument raised in Defendants' reply brief, which argument Plaintiff contends

is foreclosed by a statement made in Defendants' Answer.  (See generally Pl.'s

Mot. for Leave to File Supplemental Br. Due to Admission In Judicio, Dkt.

[56].)  In particular, Plaintiff contends that Defendants' argument that Plaintiff

was not "otherwise qualified" for employment is contradicted by the statement

in their Answer that "Plaintiff was able to perform all essential functions of her

position"–a statement that Plaintiff characterizes as an admission in judicio. (Id.

at 2 (quoting Answer, Dkt. [9] ¶ 21).)

"Neither the Federal Rules of Civil Procedure nor this Court's Local

Rules authorize the filing of surreplies." Fedrick v. Mercedes-Benz USA, LLC,

366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005) (citing Byrom v. Delta Family

Care-Disability & Survivorship Plan, 343 F. Supp. 2d 1163, 1188 (N.D. Ga.

2004)).  "To allow such surreplies as a regular practice would put the court in

the position of refereeing an endless volley of briefs." Garrison v. N.E. Ga.

<u>Med. Ctr., Inc.</u>, 66 F. Supp. 2d 1336, 1340 (N.D. Ga. 1999). Rather, surreplies typically will be permitted only in unusual circumstances, such as where a movant raises new arguments or facts in a reply brief, or where a party wishes to inform the Court of a new decision or rule implicating the motion under review. <u>Cf., e.g.</u>, <u>Fedrick</u>, 366 F. Supp. 2d at 1197 (stating "valid reason for . . . additional briefing exists . . . where the movant raises new arguments in its reply brief").

Pretermitting the issue of whether the statement in Defendants' Answer constitutes an admission <u>in judicio</u>, the Court finds the proposed surreply to be improper because the argument Plaintiff seeks to address was not raised for the first time in Defendants' reply brief. On the contrary, the argument appears prominently in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment. (Dkt. [35-1] at 16-18.) As Defendants correctly argue, Plaintiff had a complete opportunity to respond to this argument in her response brief (and to argue that it is foreclosed by a statement in Defendants' Answer) and, therefore, shall not be permitted to respond by way of surreply. Accordingly, Plaintiff's Motion for Leave to File Supplemental Brief Due to Admission <u>In Judicio</u> [56] is **DENIED**.

AO 72A
(Rev.8/82)

Second, Defendants seek leave of Court to amend their Statement of Material Facts [35-1] "in order to correct record citations due to clerical error." (Defs.' Mot. for Leave to Amend Statement of Material Facts, Dkt. [46].)  The motion is hereby **GRANTED**.

## II.    Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

AO 72A
(Rev.8/82)

Utilizing this framework, the Court considers first Plaintiff's Motion for Partial Summary Judgment before turning to Defendants' Motion for Summary Judgment.

## III.   Plaintiff's Motion for Partial Summary Judgment [34]

As stated above, Plaintiff moves for summary judgment solely on the issue of whether her breast disease constitutes a "disability" within the meaning of the ADA.  Both parties agree that the Americans with Disabilities Act Amendments Act ("ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553 (2008), governs the analysis of "disability" in this case.  The ADAAA amended the ADA "to, among other things, promulgate a more liberal standard of the term 'disabled,' making it significantly easier for a plaintiff to show disability." Barlow v. Walgreen Co., No. 8:11-cv-71-T-30EAJ, 2012 WL 868807, at *4 (M.D. Fla. Mar. 14, 2012).  Indeed, an express purpose of the ADAAA was "to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that *the question of whether an individual's impairment is a disability under the ADA should not*

*demand extensive analysis*[.]"  Pub.L. 110-325, § 2(b)(5), Sept. 25, 2008, 122 Stat. 3535.

The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]"  42 U.S.C. § 12102(1)(A).   Defendants do not dispute that Plaintiff's breast disease constitutes an "impairment."  (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Defs.' Opp'n Br."), Dkt. [43] at 4.) The issue thus becomes whether her breast disease "substantially limits" a "major life activity" as those terms are defined under the ADA, as amended by the ADAAA.

As a result of the ADAAA, "major life activities" is defined to include "the operation of a *major bodily function*, including but not limited to, functions of the immune system, *normal cell growth*, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, *endocrine*, and *reproductive functions*."  Id. § 12102(2)(B) (emphasis added).   With respect to the requirement that the impairment "substantially limit" a "major life activity," the regulations implementing the ADAAA provide that the term "substantially limits" "is not meant to be a demanding standard" but, rather, "shall be

construed broadly in favor of expansive coverage."  29 C.F.R. § 1630.2(j)(1)(i).

The regulations further provide:

> (ii)   An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.  Nonetheless, not every impairment will constitute a disability within the meaning of this section.

> (iii)  The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity.  *Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis.*

> (iv)   An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

Id. § 1630.2(j)(1) (emphasis added).

The regulations also recognize that, in light of the principles set forth above, certain types of impairments will be found, in virtually all cases, to constitute a "disability" under the ADA.  Id. § 1630.2(j)(3)(ii).  The regulations explain that "[g]iven their inherent nature, these types of impairments will, as a

factual matter, virtually always be found to impose a substantial limitation on a major life activity" and therefore should demand only a "simple and straightforward" assessment.  Id.  For example, the regulations state that it "should easily be concluded" that:

> Deafness substantially limits hearing; blindness substantially limits seeing; an intellectual disability . . . substantially limits brain function; partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function; autism substantially limits brain function; cancer substantially limits normal cell growth; cerebral palsy substantially limits brain function; diabetes substantially limits endocrine function; epilepsy substantially limits neurological function; Human Immunodeficiency Virus (HIV) infection substantially limits immune function; multiple sclerosis substantially limits neurological function; muscular dystrophy substantially limits neurological function; and major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function. . . .

Id. § 1630.2(j)(3)(iii).

In accordance with the foregoing principles, and the general instruction in the ADA that the term "disability" "be construed in favor of broad coverage, 42 U.S.C. § 12102(4)(A), the Court finds, as a matter of law, that Plaintiff's breast disease constitutes a "disability" under the ADA.  The Court reaches this conclusion in light of the unrebutted affidavit testimony of Plaintiff's treating

22

physician, Dr. Rosa Langella, that Plaintiff's breast disease is "the result of abnormal cell growth and abnormal endocrine and reproductive functioning."[6] (Langella Aff., Dkt. [34-3] ¶ 5.) Because the ADA expressly defines a "major life activity" to include normal cell growth and endocrine and reproductive functioning, and in light of the principles set forth above, the Court concludes that Plaintiff's breast disease constitutes an impairment that substantially limits a major life activity–i.e., a "disability" under the ADA. Plaintiff's Motion for Partial Summary Judgment [34] therefore is due to be **GRANTED**.

---

[6] In their reply brief in support of their own Motion for Summary Judgment, Defendants, in a footnote, object to the admissibility of this statement on grounds that it is expert testimony and Dr. Langella has not been offered as an expert witness. (Defs.' Reply Br. in Supp. of Mot. for Summ. J., Dkt. [48] at 10 n.9.) The Court finds that Defendant has failed to properly object to the admissibility of this evidence, as the objection was not raised in opposition to Plaintiff's Motion for Partial Summary Judgment but, rather, was raised, for the first time, in a reply brief in support of Defendants' own Motion for Summary Judgment. United States v. Oakley, 744 F.2d 1553, 1556 (11th Cir. 1984); see also Tafel v. Lion Antique Inv. & Consulting Servs., 459 F. App'x 847, 849 (11th Cir. 2012) ("The district court had no obligation to consider an argument raised for the first time in [a] reply brief.").

Even if the objection had been properly raised, however, the Court finds that the testimony is likely admissible under the authority of Williams v. Mast Biosurgery USA, Inc., 644 F.3d 1312 (11th Cir. 2011), which recognizes that under certain circumstances, the testimony of treating physicians may be admissible as lay witness testimony.

AO 72A
(Rev.8/82)

## IV.   Defendants' Motion for Summary Judgment [35]

Defendants move for summary judgment on both of Plaintiff's claims for discrimination and retaliation under the ADA.  The Court considers Defendants' motion with respect to Plaintiff's Count I discrimination claim before turning to the Count II claim for retaliation.

### A.   ADA Discrimination (Count I)

As stated in the Background section, <u>supra</u>, Plaintiff raises a claim against Defendants for discrimination under the ADA, alleging that Defendants discriminated against her on the basis of disability by failing to reasonably accommodate her disability (<u>i.e.</u>, by failing to give her medical leave to undergo breast surgery).  The Court sets out the legal standards governing claims for ADA discrimination before considering Defendants' arguments that they are entitled to judgment as a matter of law on Plaintiff's discrimination claim.

#### 1.   *Legal Principles*

The ADA "prohibits covered employers from discriminating based upon the known physical or mental impairments of a qualified individual with a disability."  <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278,

1285 (11th Cir. 1997) (citing 42 U.S.C. § 12112).[7] To this end, "the ADA

imposes upon employers the duty to provide reasonable accommodations for

known disabilities unless doing so would result in undue hardship for the

employer." Id. (internal quotations and citation omitted). Where, as here, a

plaintiff seeks to prove discrimination based on circumstantial evidence, the

analysis is governed by the burden-shifting framework established by the

Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir.

2004).

　　　　Under this framework, the plaintiff has the initial burden of establishing a

prima facie case of disability discrimination. Id. To establish a prima facie

case of ADA discrimination, the plaintiff must show: "(1) a disability, (2) that

she was otherwise qualified to perform the job, and (3) that she was

discriminated against based upon that disability." Id. (citations omitted). The

third element may be satisfied by showing that an individual's employer failed

---

[7] This statutory provision states, "No covered entity shall discriminate against a
qualified individual on the basis of disability in regard to job application procedures,
the hiring, advancement, or discharge of employees, employee compensation, job
training, and other terms, conditions and privileges of employment." 42 U.S.C. §
12111(a).

AO 72A
(Rev.8/82)

to make reasonable accommodation for the individual's disability (and could have done so without undue hardship). Stewart, 117 F.3d at 1285. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (citation omitted).

Once the plaintiff carries this burden of establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. Cleveland, 369 F.3d at 1193; see also Combs, 106 F.3d at 1528 ("The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, nondiscriminatory reasons for the challenged employment action."). The defendant at this stage need not prove that he or she actually was motivated by the proffered nondiscriminatory reasons; on the contrary, the defendant need only raise sufficient evidence from which a reasonable trier of fact could conclude that the employer's decision was not motivated by discriminatory animus. Combs, 106 F.3d at 1528.

Finally, if the defendant carries this burden of production, the presumption of discrimination created by the plaintiff's prima facie case

disappears.  Id.  The burden then shifts back to the plaintiff to show that the

reasons proffered by the defendant were merely pretext.  Id.  That is, "the

plaintiff has the opportunity to come forward with evidence, including the

previously produced evidence establishing the prima facie case, sufficient to

permit a reasonable factfinder to conclude that the reasons given by the

employer were not the real reasons for the adverse employment action."  Id.

(citations omitted).

>    2.    *Analysis*

In this case, Defendants argue that Plaintiff has failed to put forward a

prima facie case of disability discrimination because she has failed to show (1)

that she has a disability and (2) that she is otherwise qualified for the

employment position.[8]  (Defs.' Mem., Dkt. [35-1] at 14-18.)  In light of the

Court's ruling in Part III, supra, finding as a matter of law that Plaintiff is

"disabled" under the ADA, Plaintiff has satisfied the first element of her prima

facie case.  The only issue therefore becomes whether Plaintiff has

demonstrated that she is "otherwise qualified" for the employment position.

---

[8] Defendants also argue that it is "not clear that Plaintiff made any request for
accommodation."  (Defs.' Mem., Dkt. [35-1] at 22.)

Defendants argue that Plaintiff is not "otherwise qualified" for her position "due to absenteeism." (Defs.' Mem., Dkt. [35-1] at 16.) To survive a motion for summary judgment, a plaintiff must put forward sufficient evidence for a jury to find that the plaintiff was "a qualified individual with a disability—i.e., that the plaintiff was 'otherwise qualified' for the [job]." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1258 (11th Cir. 2001) (citations omitted). A plaintiff is "otherwise qualified" within the meaning of the ADA if he or she, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); see also Jackson v. Veterans Administration, 22 F.3d 277, 278 (11th Cir. 1994) ("A person is 'otherwise qualified' if he or she is able to perform the essential functions of the job in question."). "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered by the ADA." Holly v. Clairson Industs., LLC, 492 F.3d 1247, 1256 (11th Cir. 2007).

"Essential functions are 'the fundamental job duties of the employment position the [disabled employee] holds or desires.'" Lucas, 257 F.3d at 1258

28

(quoting 29 C.F.R. § 1630.2(n)(1)).  It is well-settled that for many (if not most)

jobs, regular attendance is an "essential function."  <u>See, e.g.</u>, <u>Jackson</u>, 22 F.3d

277 ("Because [the plaintiff] was absent numerous times within the first few

months of his probationary employment on a sporadic, unpredictable basis, he

could not fulfill this essential function of his employment, that of being present

on the job, and was not otherwise qualified."); <u>Tyndall v. Nat'l Educ. Centers,</u>

<u>Inc.</u>, 31 F.3d 209, 213 (4th Cir. 1994) (noting that an employee "who does not

come to work cannot perform any of his job functions, essential or otherwise");

<u>Paleologos v. Rehab Consultants, Inc.</u>, 990 F. Supp. 1460, 1467 (N.D. Ga.

1998) (Carnes, J.) (noting that "the most essential function of any job, and a

prerequisite to the performance of other essential functions, is attendance at

work, for an employee who is absent can perform no function, essential or

non-essential").  Indeed, this Court previously has found an employee to be not

"otherwise qualified" for employment based on the employee's undisputed

record of absenteeism:

> The undisputed evidence in this case reflects that Plaintiff had a
> prolonged pattern of excessive absence; indeed, Plaintiff does not
> dispute that she was out sick for approximately 68 days and was
> tardy approximately 25 times in 2004, excluding her FMLA leave
> in January 2004. . . .  Defendant has presented additional evidence

29

> that throughout Plaintiff's employment . . ., Plaintiff had a significant attendance and tardiness problem. In sum, the Court finds that Plaintiff has failed to present sufficient evidence to establish that she is an 'otherwise qualified individual' or that she can perform the essential functions of her job despite excessive absenteeism.

Robinson v. Fulton County, No. 1:05-cv-2250-RWS, 2008 WL 78711, at *22 (N.D. Ga. Jan. 4, 2008).

In this case, the evidence shows, and Plaintiff does not dispute, that regular attendance was an essential function of Plaintiff's job. In support of their argument that Plaintiff was not "otherwise qualified" due to absenteeism, Defendants point to the evidence they have presented regarding "Plaintiff's record of calling [sic] the morning of an absence, leaving her shift early, and asking for time off without reasonable notice left [sic] Cameron Hall." (Defs.' Mem., Dkt. [35-1] at 17.) They also point to the fact that they had to cross-train a caregiver at Cameron Hall to work in the kitchen to fill in for Plaintiff and to Plaintiff's two-day suspension in April for attendance and other performance-related issues. (Id. at 17-18.) Finally, Defendants contend that Plaintiff was absent a total of forty-two days between September and May 2009

30

and violated Defendants' attendance policies nine of the sixteen days Plaintiff

worked after her suspension and before her termination. (Id. at 18.)

This evidence, while compelling, is largely disputed by Plaintiff. As set

out in detail in the Background section, supra, Plaintiff disputes that she was

absent a total of forty-two days during the period identified by Defendants. She

also disputes certain particular absences they identify. Defendants identify

twelve particular dates on which Plaintiff allegedly was absent without notice or

with only short notice (i.e., January 24 (call out); February 8-13 (absent on

short notice); February 21 (call out); April 7-8 (absent on short notice); and

May 11-12 (call out)). Plaintiff disputes Defendants' characterization of her

absence (or that she was absent) on eleven of the twelve occasions identified:

she contends that she was not scheduled to work on February 8; was absent for

a pre-approved appointment with Dr. Langella on February 9; was absent with

approval between February 10-13; was in attendance on February 21; was

absent with approval on April 7 and 8; and, finally, that she "traded" the dates

of May 11 and 12 with another employee to work two earlier days, for which

she originally had not been scheduled.[9]

In light of the evidence Plaintiff presents to dispute eleven of the twelve absences specifically identified by Defendants, and viewing that evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has created a triable issue of fact as to whether she was not "otherwise qualified" due to absenteeism. As such, the Court cannot rule as a matter of law that Plaintiff was not "otherwise qualified" for her employment position and therefore not covered by the ADA. Furthermore, although Plaintiff does not dispute that her attendance record was "far worse" than that of any other employee, Defendants have presented no evidence regarding absences other than those specifically discussed above. These other absences, to the extent they exist, possibly could correlate with Plaintiff's breast surgery in January 2010, or with pre-approved doctor appointments in the fall of 2009, when Plaintiff's breast disease was discovered and diagnosed. In other words, to the extent other

---

[9] Defendants argue that the latter assertion contradicts Plaintiff's sworn deposition testimony "that time records reflecting her absences on short notice on May 11 and 12 were accurate." (Defs.' Reply, Dkt. [48] at 6 (citing Coker Dep., Dkt. [36-1] at 45-46).) Any such contradiction would not permit the Court to disregard Plaintiff's evidence, however, but, rather, would be for a jury to consider in assessing Plaintiff's credibility.

AO 72A
(Rev.8/82)

non-specifically-identified absences contributed to Plaintiff's "far worse"

attendance record, Defendants have presented no evidence that these absences

were not approved or otherwise excused.  Absent such evidence, the Court

cannot rule as a matter of law, based on Plaintiff's admission that her

attendance was "far worse" than that of any other employee, that Plaintiff was

not "otherwise qualified."  Defendants' Motion for Summary Judgment on

Plaintiff's Count I claim for ADA discrimination therefore is due to be

DENIED.[10]

### B.      ADA Retaliation

In addition to its prohibition on discrimination, the ADA also creates a

prohibition on retaliation, providing that "[n]o person shall discriminate against

---

[10] As stated in footnote 7 supra, Defendants also argue that it is "not clear that Plaintiff made any request for accommodation."  (Defs.' Mem., Dkt. [35-1] at 22.)  The Court, however, finds that Plaintiff has presented sufficient evidence from which a reasonable jury could find that Plaintiff made a request for a reasonable accommodation.  As set out in the Background section, supra, Plaintiff has presented evidence that she gave Ms. Ledbetter a medical note from Dr. Langella and requested two weeks off for breast surgery, after which Ms. Ledbetter went to Ms. Jean's office to discuss Plaintiff's request for time off.  A jury reasonably could conclude, based on this evidence, that Plaintiff made a request for accommodation.  As another court has explained, "To request accommodation, an individual may use 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'"  Pearce-Mato v. Shinseki, No. 2:10-cv-1029, 2012 WL 2116533, at *11 (W.D. Pa. June 11, 2012) (citation omitted).  Defendants thus are not entitled to judgment as a matter of law on grounds that Plaintiff failed to request a reasonable accommodation.

AO 72A
(Rev.8/82)

any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual has made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). In this case, Plaintiff claims ADA retaliation based on the allegation that Defendants terminated her employment in direct response to her request for a reasonable accommodation of her disability (i.e., request for medical leave). The Court sets out the legal principles governing ADA retaliation claims before considering the merits of Defendants' motion.

### 1.    Legal Principles

The same burden-shifting framework that governs claims for ADA discrimination also governs claims for ADA retaliation. Stewart, 117 F.3d at 1287. Thus, as explained in Part IV.A.1, supra, the plaintiff bears the initial burden of establishing a prima facie case. Id. "To establish a prima facie case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action." Id. "Once a prima facie case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of

retaliation."  Id.  "The plaintiff then must demonstrate that it will be able to

establish at trial that the employer's proffered non-discriminatory reasons are a

pretextual ruse designed to mask retaliation."  Id.

    *2.    Analysis*

    In this case, Defendants argue that Plaintiff has failed to make a prima

facie showing of ADA retaliation because she has failed to "establish any causal

link between her protected activity and her termination."  (Defs.' Mem., Dkt.

[35-1] at 25.)  On the contrary, Defendants argue that Plaintiff was terminated

because of poor attendance and violations of the smoking policy.  (Id. at 21.)

They argue, finally, that Plaintiff cannot demonstrate that either of these

grounds for her termination is a pretext for retaliation.  (Defs.' Reply, Dkt. [48]

at 3-10.)

    The Court, as a threshold matter, finds that Plaintiff has established a

prima facie case of retaliation through, among other things, evidence that she

was terminated within hours of her request for medical leave.  See, e.g., Thomas

v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of

causation can be met by showing close temporal proximity between the

statutorily protected activity and the adverse employment action.").  The email

authored by Ms. Jean on the date of Plaintiff's termination, stating that "*[i]t all came up* because now [Plaintiff] has to be out for 2 weeks to have her nipples removed" (Dkt. [42-1], [34-4] (emphasis added)), further supports the inference of retaliation that arises from the close temporal proximity between Plaintiff's request for leave and her termination.

The Court also finds that Defendants have carried their intermediate burden of producing admissible evidence that Plaintiff was terminated for legitimate non-discriminatory reasons–in particular, Plaintiff's attendance record and violations of the smoking policy. (See, e.g., Jean Aff., Dkt. [35-3] ¶ 17 (stating that Plaintiff was terminated based upon "overall poor performance" and "violation of smoking and attendance policies").) Defendants have also produced evidence that this decision was made on May 17, 2010, prior to Plaintiff's May 19, 2010 request for medical leave, thus precluding any possible claim for retaliation. (Id.) The issue thus becomes whether Plaintiff has presented sufficient evidence from which a reasonable jury could find these proffered reasons to be a pretext for retaliation.

Viewing the evidence in the light most favorable to Plaintiff, and drawing all reasonable inferences therefrom, the Court finds that Plaintiff has presented

sufficient evidence to establish that the reasons proffered for her termination are pretexts for retaliation. As a threshold matter, Plaintiff has come forward with evidence from which a reasonable jury could infer that the decision to terminate her was not made until after she requested medical leave on May 19. For example, Plaintiff declares that on May 19, she arrived at work early, worked the morning shift, and was terminated only after lunch–following Ms. Ledbetter's discussion with Ms. Jean regarding Plaintiff's request for leave. (Coker Decl., Dkt. [42-1] ¶¶ 8-11; see also 8/12/11 Dep. of Deborah Ledbetter ("Ledbetter Dep."), Dkt. [38-3] at 67:17-68:15 (testifying that Plaintiff began working in a normal manner on May 19, 2010).) A reasonable jury could infer that if the decision to terminate Plaintiff, in fact, had been made on May 17, Plaintiff would not have been permitted to work the morning shift of May 19–particularly in light of Ms. Jeans' stated policy that disciplinary matters be handled "right away, when [employees] walk in on their shift." (Jean. Dep., Dkt. [38-1] at 84:24-85:1.) Additionally, Ms. Ledbetter deposed that the decision to terminate Plaintiff was made on May 19: "[On May 19, 2010,] I went up to the office and was talking to Sara [Jean] . . . and we decided to let [Plaintiff] go." (Ledbetter Dep., Dkt. [38-3] at 68:23-69:2.) Given this

AO 72A
(Rev.8/82)

evidence, a jury reasonably could find that the decision to terminate Plaintiff was made after her request for medical leave–thus giving rise to a possible claim for retaliation.

With respect to the proffered reason of Plaintiff's poor attendance, the Court finds sufficient evidence from which a reasonable jury could find the proffered reason to be pretextual. First, Plaintiff declares that when she was terminated on May 19, she was told that the reason for her termination was "taking too many smoke breaks on May 15 and 16." (Decl. of Rachel Coker ("Coker Decl."), Dkt. [42-1] ¶ 11.) She further declares that at the time of her termination, no reference was made to any problem with attendance. (Id. ¶ 12.) If a jury finds Plaintiff's version of events to be true, and finds that poor attendance was not offered as a reason for Plaintiff's termination contemporaneously with the termination, a reasonable jury could find this reason–offered after the fact–to be a pretext for discrimination. See, e.g., Cleveland, 369 F.3d at 1194 (". . . [S]hifting reasons allow the jury to question [a defendant employer's] credibility. Once [that] credibility is damaged, the jury could infer that [the employer] did not fire [the plaintiff] because of the [reason proffered], but rather because of her disability.").

With respect to Plaintiff's violation of the smoking policy, the Court similarly finds sufficient evidence from which a jury reasonably could find the proffered reason to be pretextual. In particular, the Court finds a genuine issue of fact to arise on the basis of Ms. Jean's email, authored on the same date as Plaintiff's termination. The subject line of the email read, "rae," and the first line of the email read, "Excessive smoking on 5-15 & 5-16." (Dkt. [42-1].) The line immediately below read, "*It all came up* because now she has to be out for 2 weeks to have her nipples removed. She still has milk and puss coming out of them." (Id.) A jury reasonably could conclude that if Plaintiff, in fact, had been terminated for violating the smoking policy, Ms. Jean would not have written an email to a co-worker discussing Plaintiff's impending breast surgery and request for medical leave. Indeed, a reasonable jury could infer from the crude references to Plaintiff's medical issues, and the prefatory language "[i]t all came up," that the real reason for Plaintiff's termination was her request for leave, and the proffered reason of "[e]xcessive smoking on 5-15 & 5-16" a mere pretext for retaliation.

In sum, the Court finds that Plaintiff has presented sufficient evidence from which a jury reasonably could conclude that the real reason Plaintiff was

AO 72A
(Rev.8/82)

terminated was her request for medical leave. Accordingly, the Court cannot rule as a matter of law that Defendants did not retaliate against Plaintiff for making that request, and Defendants' Motion for Summary Judgment on Plaintiff's Count II claim for retaliation must be **DENIED**.

## Conclusion

In accordance with the foregoing, Plaintiff's Motion for Partial Summary Judgment [34] is **GRANTED**. Defendants' Motion for Summary Judgment [35] is **DENIED**. Defendants' Motion for Leave to Amend Statement of Material Facts [46] is **GRANTED**, and Plaintiff's Motion for Leave to File Supplemental Brief Due to Admission In Judicio [56] is **DENIED**.

This case is **REFERRED** to Chief Magistrate Judge Janet F. King for assignment to a Magistrate Judge for mediation. If the case is not settled, the parties shall submit a consolidated proposed pretrial order within 30 days of the completion of mediation.

**SO ORDERED**, this  18th  day of September, 2012.

_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)